# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 14, 2013 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEWIS

**Appeal from the Criminal Court for Putnam County**
**No. 10-0875     David A. Patterson, Judge**

---

**No. M2013-00212-CCA-R3-CD - Filed November 27, 2013**

---

A Putnam County jury convicted the Defendant, Christopher Lewis, of second degree murder, and the trial court imposed a fifteen-year prison sentence. On appeal, the Defendant contends that: (1) the evidence was insufficient to support his conviction; (2) the trial court erred by denying the Defendant's motion to sequester the jury; (3) the trial court erred by admitting photographs of the body of the deceased; and (4) the trial court erred by allowing certain witness testimony. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined. JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Randy Chaffin, Cookeville, Tennessee, for the appellant, Christopher Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle Consiglio-Young, Assistant Attorney General; Randall A. York, District Attorney General; Anthony Craighead and Beth Willis, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the death of the Defendant's wife, Amy Lewis, whose body was found inside the couple's home on August 1, 2010. A Putnam County grand jury indicted the Defendant for the second degree murder of his wife.

At trial, the parties presented the following evidence: Charles Wilson, a Cumberland County Sheriff's Department deputy, testified that, on August 1, 2010, he was on patrol with

Chief Scott Isles. Deputy Wilson recalled that at approximately 5:30 p.m., he responded to a call about a body found in a residence on Jim Garrett Road. At the time, Deputy Wilson believed the address to be located in Cumberland County. As they neared the location, a dispatcher contacted Deputy Wilson and informed him that the address was actually located on the Putnam County portion of Jim Garrett Road. Deputy Wilson said that, because they were so close to the location by this point, the two officers decided to proceed to the address to see if the Putnam County officers needed assistance.

Deputy Wilson testified that he and Chief Isles were the first officers to arrive. The dispatcher had informed Deputy Wilson that a female had placed the phone call, so he looked for a female but found no one on the scene. Deputy Wilson said that, as he surveyed the property around the single-wide trailer, Chief Isles knocked on the door of the trailer with no response. After confirming that there was no one around the perimeter of the trailer, Deputy Wilson went up on the porch and knocked on the door, also receiving no response. Deputy Wilson then checked the door to see if it was unlocked. The door was unlocked and both men entered the residence. Deputy Wilson stated that the front door of the trailer opened into the living room. From here, he proceeded through the kitchen to a short hallway that led to a bedroom located at the end of the trailer. As Deputy Wilson began walking down the hallway, he observed a female body lying just inside the bedroom door. Deputy Wilson identified a photograph of the victim lying on her back as consistent with her position and appearance at the time he first saw her lying on the floor.

Deputy Wilson testified that, upon reaching the threshhold of the bedroom doorway, he could "obviously tell that [the victim] was deceased." He called for Chief Isles, who came down the hallway and observed the victim as well. Both officers then exited the residence, secured the scene, and waited for Putnam County law enforcement, who arrived approximately fifteen minutes later. After Putnam County law enforcement arrived, Deputy Wilson and Chief Isles remained on the scene to help secure the outside of the trailer and give statements. Deputy Wilson estimated that he was at the crime scene for approximately an hour and during this time the Defendant did not come to the scene.

Margaret Lewis, the Defendant's mother, testified that the Defendant and the victim were married seventeen years and had four children together, ages 17, 14, 13, and 11. Ms. Lewis described the proximity of her home to the home that the Defendant and the victim shared. She said that the Defendant's home was located "right behind" her home with a driving time of three minutes. She explained that there was also a more direct foot path between the two homes that would take about two minutes to walk. Ms. Lewis described their homes as being located in a wooded area, "in the country." Ms. Lewis said that the Defendant and the victim had lived in the single-wide trailer located on the property since 2000.

Ms. Lewis testified that she and the victim got along well and that she had "no problem" with her daughter-in-law. Ms. Lewis recalled the events leading up to her discovery of the victim's body. She said that the Defendant came to her house on Saturday morning, July 31, 2010, to "get a couple of drinks" on his way to work. Ms. Lewis agreed that she had told Detective Golden that, on that morning, the Defendant told her that the victim was mad at him, had hit him with a beer bottle, and that Ms. Lewis had observed a mark on the side of the Defendant's head. She then testified that the Defendant did not tell her the victim had hit him with a bottle, explaining that she had lied to Detective Golden. When asked why she had lied, she stated, "I cannot answer that." She also testified that she had not seen an injury on the Defendant's head, as she had told Detective Golden during the investigation. Upon further questioning as to why she would lie to the police about her son telling her he had fought with the victim, Ms. Lewis said that the situation was "stressful."

The State then asked Ms. Lewis about a second audio-taped interview, wherein she told Detective Golden that the Defendant did not seem upset when she spoke with him on Saturday morning, July 31, 2010. Ms. Lewis also stated in the interview that she observed an injury to the Defendant's head, and when she inquired about it, the Defendant told her that the victim had hit him with a beer bottle. In the interview, she stated to Detective Golden that she also observed injuries to both of the Defendant's arms and his neck. Ms. Lewis confirmed that she made these statements but maintained that they were false. Again, Ms. Lewis stated that she could not offer an explanation for why she had lied to the police about a fight between the Defendant and the victim. Ms. Lewis agreed that she had told Detective Golden a third time about a fight between the Defendant and the victim. Ms. Lewis agreed that she had elaborated, providing Detective Golden with specific detail about the scratches she observed on the Defendant's arms. She agreed that the Defendant was not charged at that point in the investigation, but maintained that she could not provide a reason for her lies to the authorities. Ms. Lewis testified that she and the Defendant had never spoken about her telling the police about a fight between he and the victim, or spoken about the case at all.

Ms. Lewis testified that, in addition to her false statement regarding the fight, she truthfully told Detective Golden that the Defendant left for work and returned to Ms. Lewis's house on Saturday, July 31, after dark, where he stayed for the night. She recalled telling Detective Golden that she had paid the Defendant's electric bill "if they didn't pay it" and testified that this too was a true statement.

Ms. Lewis testified that the Defendant spent Sunday, August 1, 2010, at her home. She said that later in the afternoon, he told her he was going home to check on the dogs and to get a Powerade. The Defendant walked home and, upon his return, he told Ms. Lewis that there was "something wrong" with the victim and that he thought she was dead. At the Defendant's request, Ms. Lewis walked over to the Defendant's home and found the victim

dead. When she returned home, she told the Defendant the victim was dead and he responded, "Mamma, they're probably going to think that I did it." Ms. Lewis said that she asked the Defendant why he would think that and he said, "well, she's laying over there dead."

Ms. Lewis testified that the Defendant remained at Ms. Lewis's home while she checked on the victim and while she called 911. Ms. Lewis stated that the Defendant "just left before Detective Golden pulled in [my] driveway." She agreed that she told Detective Golden, "if I could have kept him here to talk to you, buddy, I sure would have."

Ms. Lewis testified that she called 911 and told the operator that the victim was dead and that the Defendant had left her house. Ms. Lewis agreed that she was "upset" when she called 911. Ms. Lewis stated that she could not remember whether she told the 911 operator that her son had been in a fight with the victim earlier and that the victim had hit the Defendant with a beer bottle. Ms. Lewis maintained that her statements about the Defendant and the victim's fight was a lie and that she was now telling the truth in court. When asked if her testimony recanting her statement to police about a fight between the Defendant and the victim helped the Defendant, Ms. Lewis responded, "It could only help my son if everybody else seen and could see the marks that I said that he had." Ms. Lewis stated that her son was not "running" from police, he "had just left." She agreed that if he had fled the scene that would indicate some guilty knowledge on his part.

On cross examination, Ms. Lewis testified that, on Saturday morning, July 31, she heard the victim "yelling for the dogs." She was uncertain as to the time of morning that this occurred. She agreed that when the Defendant returned to her house Sunday afternoon after finding the victim's body, he was upset and crying. She stated that she walked to the Defendant's house, went inside, and found the victim lying on the floor. She said that she first spoke to the victim asking her to "get up." When the victim did not respond, Ms. Lewis felt for a pulse. Ms. Lewis said she could not feel a pulse so she "pulled [the victim] over toward her back" and checked her chest and then neck for a heartbeat. Finding none, she placed her hand in front of the victim's mouth and did not feel the victim breathing.

On redirect examination, Ms. Lewis agreed that she never mentioned to Detective Golden that she heard the victim calling for the dogs on Saturday morning. She explained that she "didn't think about it." As to her physical contact with the victim after finding her lying on the trailer floor, Ms. Lewis agreed that she told Detective Golden that she felt the victim for a heartbeat and the victim was cold. Ms. Lewis agreed that she never mentioned moving the body. Despite her testimony on cross-examination that she "pulled the [victim] over toward her back," on redirect, Ms. Lewis said that when she found the victim, the victim was lying on the floor on her back, by the bed.

-4-

On recross examination, Ms. Lewis was again asked about the victim's position on the floor when Ms. Lewis found her on Sunday, August 1. Ms. Lewis testified that she found the victim, "laying [sic] on her left side," and that Ms. Lewis took her arm and "pulled her over onto her back."

Tina Evans testified that she worked as a 911 dispatcher on August 1, 2010, and received a phone call at around 5:00 p.m. from a woman identifying herself as Margaret Lewis. Ms. Evans stated that the first time Ms. Lewis called, the line was disconnected and Ms. Lewis called a second time. Ms. Evans identified the 911 audio recordings of the conversations between she and Ms. Lewis. The audio recordings were played for the jury. The first recording indicates that the first phone call was placed at 5:28 p.m. on August 1, 2010. Ms. Lewis tells Ms. Evans that the victim is dead and provides the address. Ms. Lewis says that she is outside of the residence but needs to "go home." The phone call is then disconnected.

The recording of the second phone call indicates that this call was placed at 5:37 p.m. on August 1, 2010. In the recording, Ms. Lewis confirms that the victim lived in Putnam County. She informs Ms. Evans that the door to the trailer is unlocked and that Ms. Lewis had "tied up the dogs." Ms. Lewis tearfully tells Ms. Evans that the Defendant told her that the victim was "upset." She says that the Defendant and the victim had an argument on Saturday, July 31, and the Defendant left their marital home to "cool off." She says in the recording that the victim hit the Defendant with a beer bottle on the head and arms. Ms. Lewis says that the Defendant thought the victim was at work on Sunday, August 1, and so he went to their home, and found the victim dead. Ms. Lewis states in the recording that the Defendant told her that the victim looked like she was dead. Ms. Lewis tells Ms. Evans that she did not believe the Defendant, so she went to the trailer where she found the victim lying dead in the bedroom. Ms. Lewis tells Ms. Evans that the Defendant had "left" and she did not know where he went.

Amber Mayberry, the victim's sister, testified that she had known the Defendant for "seventeen plus years." She described her relationship with the Defendant as "good" and stated that she was "close" to the victim. She said that she babysat for the Defendant and the victim "[w]henever needed, whenever [she] could."

Ms. Mayberry testified that she spoke with the victim on Friday, July 30, 2010, after Ms. Mayberry had left work for the day. Ms. Mayberry explained that she was scheduled to watch the Defendant and the victim's four children that night. She offered to pick the children up, but the victim told Ms. Mayberry that she and the Defendant would bring the children to Ms. Mayberry's house "sometime that evening." Ms. Mayberry could not recall when the Defendant, the victim, and their children arrived at her house but said that it was

dark and after dinner. The Defendant and the victim stayed at Ms. Mayberry's house "no more than an hour" and then left the children to spend the night. Ms. Mayberry said that "everything" appeared to be "fine" between the Defendant and the victim when they dropped the children off.

Ms. Mayberry testified that on the following day, Saturday, July 31, 2010, she took the four children to her mother's house in the evening where the children spent Saturday night. The next morning, August 1, 2010, Ms. Mayberry went to her mother's house to retrieve the children. She said that she brought them back to her home to "do yard work." At around 4:00 p.m., she decided to take the children home since the following day was their first day of school. She instructed the children to gather their belongings to go home and asked one of the children to call the Defendant to let him know they were en route, but the Defendant did not answer his phone. Ms. Mayberry said she then asked the child to call the victim, who also did not answer her phone. Ms. Mayberry said that she then received a phone call from a colleague at work. Based upon this phone call, she instructed one of the children to call the Defendant's sister, who asked to speak with Ms. Mayberry. Ms. Mayberry said that, after learning of the victim's death between 5:00 p.m. and 6:00 p.m., she turned the car around and took all four children back to her home where the children stayed for the night.

Ms. Mayberry testified that the Defendant never called to notify her of her sister's death. She said that she and her father spent most of the night at the crime scene while her mother stayed with the victim's children. She said that during the time she was at the crime scene, the Defendant was not there.

Rebecca Kilby testified that in July 2010, she and the victim worked together in a "group home" caring for "the mentally challenged." Ms. Kilby said that she and the victim were scheduled to be at work at 7:00 a.m. on Saturday, July 31, 2010. She said that the victim normally was at work fifteen to thirty minutes early, but on July 31 she did not show up at work at all. Ms. Kilby called the victim approximately ten times and never received an answer. She said that the victim's unexplained absence struck her as "unusual" and caused "concern" and so she notified the house manager.

Bo Sherrell, a Putnam County Sheriff's Department deputy, testified that on August 1, 2010, he was dispatched to a residential address located on Jim Garrett Road. When he arrived, he found his Sergeant, Joe Nash, inside the residence standing by a bedroom door. Deputy Sherrell said that he did not enter the bedroom but from where he stood he could see a body, from the knees down, lying on the floor in the bedroom. He also observed a "beer bottle stuck in the wall" above where the victim was lying.

-6-

Deputy Sherrell testified that Sergeant Nash instructed him to keep a crime scene log documenting the time, date, who entered the crime scene, and for what purpose. At some point, Detective Golden arrived and asked Deputy Sherrell to go with him to speak with the Defendant's mother, Ms. Lewis. Deputy Sherrell rode along and was present during Detective Golden's conversation with Ms. Lewis. The two men then returned to the Defendant's trailer. Detective Golden went inside the residence while Deputy Sherrell remained outside.

Deputy Sherrell testified that he was talking to dispatch on his cellular telephone when he noticed several dogs behind the residence "acting funny." Deputy Sherrell said he decided to walk around to the back of the trailer to see if the Defendant was there. He said that about two hundred yards behind the trailer he found a hole that was approximately four feet wide, ten feet long and two and half to three feet deep. Inside the hole, he observed a pile of dirt with a shovel lying on the pile. He said that there was also a tractor with a front-end loader in the front yard with mud on the loader and mud on the tires. Deputy Sherrell identified a photograph of the freshly dug hole behind the Defendant's trailer.

Deputy Sherrell testified that because there was a dead body inside the trailer and the hole was large enough to hold the body, he believed the hole to be a grave. He said that there were not any dead dogs or bones lying anywhere in the area.

Deputy Sherrell testified that he was at the crime scene for eight to ten hours and that during this time the Defendant never showed up at the trailer or make any contact with authorities. Deputy Sherrell confirmed that the Defendant was not at Ms. Lewis's house when Deputy Sherrell and Detective Golden met with her.

Detective Silas Golden, a Putnam County Sheriff's Department detective, testified that he arrived at the crime scene at approximately 6:40 p.m. on August 1, 2010. Detective Golden confirmed that the Defendant was not present at his trailer when Detective Golden arrived or at any time during the investigation that night. Detective Golden recalled that he first obtained the crime scene log to ensure that the scene was secure. He then proceeded inside the trailer home, where he found the victim in a "night gown" lying on the floor of the bedroom. Detective Golden described the bedroom where the victim was found as "in disarray."

The State showed Detective Golden a picture of the victim's face. Detective Golden testified that the photograph did not depict how the victim looked when he first saw her. He said the photograph showed a more "advanced state of death." He explained that he arrived on the scene and then left to obtain search warrants, returning approximately seven hours later. He then remained at the scene until 4:00 or 5:00 a.m. The photograph of the victim

was taken after he returned with the warrants, which allowed time for further decomposition of the body.

Detective Golden identified photographs he took of the hole found behind the trailer and the front loader that was in the front yard. Detective Golden testified that he observed what appeared to be "fresh dirt" in the bucket of the front loader. He also noted that the front loader tires had "wet" mud caked in the treads.

Detective Golden testified that the Defendant's mother, Ms. Lewis, lived a short distance from the Defendant. He said that you could reach Ms. Lewis's home from the Defendant's home by either driving, or by walking on a wide foot path between the two residences. Detective Golden estimated that the hole found behind the trailer was approximately 100 yards from the trailer and near the footpath that led to Ms. Lewis's residence. Detective Golden stated that he filmed the walk from the Defendant and the victim's trailer to the hole. This video recording was played for the jury.

Detective Golden testified that he spoke with Ms. Lewis "a couple of hours" after she called 911, and he described her demeanor as "quite calm." Detective Golden said that, during his conversation with Ms. Lewis, he told her how important it was for her to tell the truth in her statement. Detective Golden confirmed that Ms. Lewis told him that the Defendant had said that he and the victim had fought and that he had been hit in the head with a beer bottle. Detective Golden testified that when she made this statement, Ms. Lewis did not seem at all "foggy" or unclear about the details. He said that she further told him that the Defendant stated to her, "Mamma, they're probably going to think I did it," and then he left her residence. About the Defendant's departure, Ms. Lewis told the detective that "if [she] could have kept him [at her house] to talk to [the detective] [she] would have." Detective Golden stated that Ms. Lewis never told him that she heard the victim yelling at the dogs on Saturday morning, July 31, 2010.

On cross-examination, Detective Golden identified photographs taken of other rooms in the victim's home and agreed that the home was "not clean." He further agreed that he did not know when the beer bottle in the wall of the bedroom was placed there. As to the placement of the beer bottle in the wall, Detective Golden agreed that, based on the position of the bottle, it could have been used as a "very crude and a very inappropriate" doorstop for the bedroom door.

Dr. Thomas Deering testified as an expert witness in the field of forensic pathology. Dr. Deering said that he worked for Forensic Medical Management Services and performed the autopsy in this case. Dr. Deering explained that he performs a physical examination to try to determine the cause of death and the manner of death. There are "thousands of

potential choices" for a cause of death, however, the manner of death is limited to five "choices": homicide, suicide, accident, natural, and undetermined. He explained that the "undetermined" category is "kind of our wastebasket" if the medical examiner either doesn't know the cause of death or "can't decide between two equally plausible choices."

Dr. Deering explained the process of the physical examination, stating that he examines the body externally and internally, and collects specimens for the toxicology analysis as well as any additional specimens needed for his use in microscopic findings. Dr. Deering identified the autopsy report in this case, which included his findings, the toxicology report, and a report of the microscopic findings. The victim's autopsy was performed on August 2, 2010.

Dr. Deering testified that the victim was sixty-two inches tall and weighed two hundred and twenty eight pounds. Dr. Deering stated that the victim's eyes showed "mildly collapsed globes and clouded corneas." He explained that this indicated decomposition changes in the body. He said that, as the body decomposes after death, the eyeballs, or "globes," collapse. This decomposition causes the eyes to become "clouded," making it difficult to see clearly through the front of the eyes. Because of the presence of collapsed "globes," Dr. Deering was unable to discern some findings in the eyes that could help determine the cause of death, such as "petechiae eye." Dr. Deering said that petechia is often associated with asphyxia, a condition where there is an insufficient supply of oxygen reaching the major organs.

Dr. Deering testified about his examination of the victim's heart. He said that he did not find any blood clots, which are consistent with a heart attack, in the coronary arteries. Dr. Deering did not find any scar tissue consistent with a past heart attack. He did not find any atherosclerosis on the aorta or abnormalities on the other vessels. He did note "thickness" around one of the ventricles "which suggests that [the victim's] four hundred ten gram heart may be a little large for her." He stated that the heart did not "look large" but, given her height and weight, it is possible her heart was enlarged. Dr. Deering said that a person with an enlarged heart "can suffer from hypertension" and are "at some risk" for a fatal heart rhythm, however, he could not conclude that this was the cause of death in this case.

Dr. Deering testified that he found no external evidence of acute trauma or injury. He said that he conducted an interior forensic nectasection, where he examined the neck layers for bruising, and found no injury. Dr. Deering said that the victim tested positive for alcohol in her system, but the amount was consistent with what is produced in the body after death.

Dr. Deering testified that he was unable to determine a specific cause of death. He

was able to rule out gunshot, stabbing, blunt force trauma, strangulation, heart disease, lung disease, and cancer. As to suffocation, he stated the following:

> Suffocation is a difficult, is always a difficult cause of death because it's something that can happen that leaves no sign or very, very subtle signs. And in the case of a body that decomposed, and this body was moderately decomposed, subtle findings are basically erased by the changes of decomposition. So I consider suffocation in a case where there might be circumstances I'm told that are suspicious and when I find nothing else, particularly in a young person, thirty four years old person, and I have no really good cause of death, it's something that I always consider.

Dr. Deering noted that in his report he stated that "suffocation cannot be ruled out."

The State offered Dr. Deering a hypothetical situation, where a pillow was held over a person's face, cutting off their air supply and ultimately suffocating the person. Dr. Deering testified that suffocation, under those circumstances, might leave no trace of the conduct. He said there "might be" some bruising around the lips if the pillow "or some object" were pressed against the mouth. He stated that there might also be evidence of petechiae in the eyes or defensive wounds if the person fought back. He explained that these are symptoms he would look for, but there may be nothing because a pillow "doesn't leave any marks."

Dr. Deering testified that with asphyxia, a person loses consciousness within six to ten seconds, but the oxygen supply would need to be cut off for two to four minutes to result in death. He could not state an exact time for death as a result of suffocation but explained that "it takes a period of time in order to suffocate someone."

Dr. Deering testified that he could not determine the exact time of death for the victim, but that he had a "general impression" based on his experience. He explained that heat can speed up the process of decomposition and that a larger person retains body heat which accelerates the decomposition process. Dr. Deering opined that a person in a cool environment may exhibit signs of slower decomposition. Considering all the circumstances of this case, Dr. Deering estimated that the victim had been deceased for two to three days.

Dr. Deering testified about the presence of "fixed lividity" in the victim. Dr. Deering explained that when a person dies, the blood will pool to their back if they are lying on their back. If they are rolled over, the blood will pool onto their front. After six to ten hours, the blood becomes "fixed," so that "even if you roll them over, [the blood] will no longer obey gravity." He stated, "It's because the blood has begun to leak out of the vessels and it can't

move through the vessels anymore, it's sludged and stopped." He said that this is one indication of how long a person has been dead and that he can "get some idea" of whether a body has been moved or not based on the lividity pattern.

Dr. Deering identified a photograph taken of the victim's back and referenced the picture as he explained lividity as it related to the victim. Referencing another photograph, Dr. Deering pointed out lividity, indicating that the victim was lying on her left side long enough for the blood to pool and stay fixed. He pointed out how the left leg was "purple" while the right leg was not, which was consistent with the discoloration or lividity on the left arm and not on the right. He opined that the victim had been moved and was on her left side "for a number of hours" before she was moved. Dr. Deering's autopsy report summarized his findings as follows:

> The decedent's lividity is fixed and discolored (from decomposition changes). It is localized to the head, neck, left shoulder, left arm, left breast, left side of the chest, left hip and left foot.

> Based on scene photos that showed the body to be face up and on its back (supine) on the floor by the bed, it is my opinion that the body has been moved.

> Because lividity is gravity dependent, the body was initially left side down for multiple hours until the lividity became fixed. The body was subsequently moved or rolled.

On cross-examination, Dr. Deering confirmed that he did not find any medical proof that the victim's death was a homicide. He agreed that he could not rule out suffocation and explained:

> When I have a case like this in a young person that I don't have either good natural disease, I don't have any traumatic injuries, I don't have any toxicology that explains the death and there are some suspicious circumstances that are given to me, I always consider [suffocation].

Dr. Deering agreed that a person who is heavier may experience more health problems due to their weight.

Jason Beaty, the Defendant's cousin, testified that he and the Defendant were "close" as they were growing up but lost touch when Mr. Beaty went to college. Mr. Beaty stated that he knew the victim well. He recalled learning of her death on Sunday, August 1, 2010. He said that he received "some" text messages asking if he knew the whereabouts of the

-11-

Defendant. He called his mother and the Defendant's sister to tell them he did not know the Defendant's location, and he learned of the victim's death. Mr. Beaty said he then attempted to help the family locate the Defendant. He called the Defendant's cellular phone approximately five times but received no answer. Later that same day, at around 10:00 or 11:00 p.m., the Defendant called Mr. Beaty. Mr. Beaty asked the Defendant what had happened, and the Defendant told Mr. Beaty that he and the victim were in an argument, the victim hit the Defendant, and then the Defendant hit the victim before leaving. Mr. Beaty described the Defendant as "crying and distraught" as Mr. Beaty spoke with him over the phone.

Mr. Beaty testified that the next morning, Monday, August 2, he went to see the Defendant, who had stayed at Mr. Beaty's mother's house Sunday night. The Defendant told Mr. Beaty that he and the victim had an argument and the victim hit the Defendant with a bottle. The Defendant said that he hit the victim and then he left. Mr. Beaty said that he did not recall seeing any injuries on the Defendant when he spoke with him.

Chad Ownby testified that in August 2010, he worked for American General Life and Accident as an insurance agent. This company had issued a $400,000 life insurance policy on the victim with the Defendant listed as the beneficiary. Upon learning of the victim's death, Mr. Ownby arranged to meet with the Defendant to fill out the paperwork for the claims process. Mr. Ownby went to the Defendant's residence and the Defendant suggested they do the paperwork at his mother's house, a short distance away. The two men went to Ms. Lewis's house and worked on the necessary paperwork. During this time, the Defendant told Mr. Ownby that an argument had occurred between the Defendant and victim and that the Defendant stayed at his mother's house that night to "cool off." When he returned to his home, he found his wife dead. Mr. Ownby told the Defendant he would need the death certificate to process the claim.

Mr. Ownby testified that, at some point, the insurance company decided it may not pay the claim, and Mr. Ownby so informed the Defendant, explaining that he needed the death certificate stating the cause of death to proceed with the claims process. In October 2010, the Defendant called Mr. Ownby about the fact that the insurance company had not yet paid the claim. Mr. Ownby described the Defendant as becoming "increasingly frustrated and irate." The Defendant told Mr. Ownby, "you had better pay my f**king money tomorrow at this time at your location. If you don't do it there, I'm going to Brentwood to your corporate headquarters to get my f**king money." Mr. Ownby said that the Defendant ended the phone call "abruptly." Mr. Ownby said that he contacted the "home office" in reference to his exchange with the Defendant. He said that the Defendant did not come to his office the following day and he has not since had contact with the Defendant.

Mr. Ownby testified that the Defendant told him that the policy contained a two-year "incontestability period" and the policy was beyond the "incontestability period." The policy was approximately three years old. Mr. Ownby explained that an "incontestability period" means that a claim will be paid regardless of what happened unless there was fraud on behalf of the beneficiary or a criminal act.

The defense called the Defendant and victim's fourteen-year-old daughter, C.L.,[1] to testify. C.L. testified that her parents dug the hole police found behind the trailer home "a while before [the victim] died." She explained that there was a stump in the bike path where the family rode four-wheelers. She said the Defendant was removing the stump from the pathway with a tractor. C.L. recalled that when the victim saw the tractor "she wanted to play on it" so she began "digging and stuff." C.L. identified a picture of the front loader in the front yard as the same tractor her mother, the victim, had used to dig the hole.

On cross-examination, C.L. testified that her father did not tell her of her mother's death until "a couple of days before her funeral." She said that he did not tell her that he found the victim's body on Sunday and then left. C.L. estimated that the hole in the back yard had been dug two weeks before the weekend her mother died. C.L. could not recall the reason why the hole was not filled after the stump was removed. She said that the tractor was not used for any other purpose after the hole was dug.

A.L., the Defendant and victim's seventeen-year-old son, identified a photograph of the hole located behind the trailer home. He explained that the hole had been dug to bury two or three dogs that had died. He said that his mother and father dug the hole. A.L. said that they did not fill the hole after digging it because they planned to use the dirt to make a "berm" on his dirt bike track. A.L. estimated that the hole was dug approximately a month and a half to two months before his mother's death. In the process of digging the hole, a stump was removed from that location.

On cross-examination, A.L. testified that his father never called or came by his aunt's house to tell him that his mother was dead. A.L. reiterated that his mother and father removed the stump and dug the hole together. He did not see either the Defendant or the victim use a shovel while digging. A.L. said the stump that was removed "should be around the grave somewhere." A.L. said that the hole was intended for use to bury three dogs that had died. He said that one of the dogs died from a snake bite and the other two were "pretty old." He said that the three dogs died around the same time. He estimated that the dog that was bitten by a snake died "a little while before Mom died" and the other two dogs died a week and a half to two weeks before.

---

[1]We refer to witnesses who are minors by their initials.

On redirect examination, A.L. testified that his maternal grandparents took his cellular telephone from him, stating that they had to "talk to Verizon about the bill." He said that because his phone was taken from him, he does not know whether his father called him on his cellular phone after his mother died.

Based on this evidence, the jury convicted the Defendant of second degree murder, as charged. The trial court conducted a sentencing hearing and imposed a sentence of fifteen years. Following the denial of his timely but unsuccessful motion for a new trial, the Defendant filed a timely notice of appeal.

## II. Analysis

The Defendant contends that: (1) the evidence was insufficient to support his conviction; (2) the trial court erred by denying the Defendant's motion to sequester the jury; (3) the trial court erred by admitting photographs of the dead victim; and (4) the trial court erred by allowing certain witness testimony.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his conviction for second degree murder. He argues that the State failed "to prove any casual [sic] connection between the acts of the Defendant and the death of the victim." The State responds that the evidence established that the Defendant knowingly engaged in conduct that caused the victim's death.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557–58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). The jury's verdict of guilt, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not by this Court. *State v.*

*Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The guilt of a defendant, as well as any fact required to be proved, may be established by direct evidence, by circumstantial evidence, or by a combination of both. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Recently, in *State v. Sisk*, our Supreme Court clarified the use of circumstantial evidence as a basis for a conviction. 343 S.W.3d 60, 65 (Tenn. 2011). In *Sisk*, the defendant was convicted at trial of aggravated burglary and theft, primarily on the basis of circumstantial evidence. *Id.* at 63–64. The circumstantial evidence involved a cigarette butt found at the crime scene which contained a match to the defendant's DNA. *Id.* On appeal, this Court reversed, holding that the evidence was insufficient to support the convictions. *Id.* at 60. The State appealed, arguing that the convictions should be reinstated. *Id.* On appeal our Supreme Court chronicled the history of the use of convictions based on circumstantial evidence stating:

> A criminal offense may, of course, be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456–58, 461 (1958). Ultimately, however, the jury must decide the significance of the circumstantial evidence, as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable*, 313 S.W.2d at 457). Appellate courts may not substitute their own inferences for those drawn by factfinders in circumstantial evidence cases. *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

> Years ago, in *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610 (1971), this Court adopted a standard of proof in criminal prosecutions based exclusively upon circumstantial evidence that purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Id.* at 612. This Court also stated in *Crawford* that in such cases, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613. This language was recited for years by Tennessee courts as controlling in those cases in which the sufficiency of exclusively circumstantial evidence was at issue; indeed, it was used by both the Court of

-15-

Criminal Appeals and the trial court in this case. *See Sisk*, 2010 WL 3502512, at *2. In *State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010), however, we pointed out the inconsistency between the terminology employed in *Crawford* and its progeny and the standard of proof applied by the United States Supreme Court in those cases in which the evidence is solely circumstantial. *See Jackson*, 443 U.S. at 326, 99 S. Ct. 2781 (rejecting the notion "that the prosecution [i]s under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). Finally, in *State v. Dorantes,* 331 S.W.3d 370, 381 (Tenn. 2011), we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. Although we observed in *Dorantes* that, as a practical matter, there was little difference between the federal standard and the "reasonable hypothesis" language used in *Crawford*, we also noted that, depending on the nature of the circumstantial evidence presented at trial, the adoption of the federal standard of proof could result in a different outcome in some cases. Id.

*Id.* at 65 (footnotes omitted). Based on that reasoning, our Supreme Court reinstated the defendant's convictions, finding:

The undamaged condition of the cigarette butt, Detective Grooms' testimony that it was unlikely the cigarette had been tracked into the house and that the victims themselves were not smokers, the proximity of the Defendant's residence to the burglarized house, the fact that the Defendant often was seen smoking outside and had never been invited into the victims' residence, and the Defendant's flight from police on January 3, 2007, all corroborate the DNA evidence. While the intermediate appellate court posited that "[s]everal plausible explanations for the presence of the defendant's cigarette inside the victims' residence come to mind, including that the cigarette butt was 'tracked' into the residence," *Sisk*, 2010 WL 3502512, at *3, our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State. Given Detective Grooms' description of the cigarette butt and its location [on the bottom of his shoe], it was perfectly reasonable for the jury to believe the State's theory that the Defendant had entered the victims' residence during the burglary and left the cigarette butt there. The evidence is sufficient to support the jury's verdict.

*Id.* at 67-68 (footnote omitted). By reinstating the convictions in *Sisk*, our Supreme Court

made clear that "[t]he standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant was convicted of second degree murder, which is defined as the "knowing killing of another." T.C.A. § 39-13-210(a)(1). In other words, a conviction for second degree murder requires proof beyond a reasonable doubt that the defendant unlawfully and knowingly killed the victim. *See* T.C.A. §§ 39-13-201, -210(a)(1) (2010). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." T.C.A. §§ 39-11-106(20), -302(b) (2010). "[A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). "Whether a defendant acted 'knowingly' in killing another is a question of fact to be addressed by the jury." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010) (citing *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000); *State v. Brunner*, No. W2008-01444-CCA-R3-CD, 2009 WL 2151822, at *6 (Tenn. Crim. App., at Jackson, July 17, 2009), *perm. app. denied* (Tenn. Nov. 23, 2009)). "[I]t is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' 'from surrounding facts and circumstances.'" *Id*. (quoting *State v. Lowery*, 667 S.W.2d 52, 57 (Tenn. 1984)).

The evidence, considered in the light most favorable to the State, shows that the Defendant was the last person with the victim while she was alive. The Defendant and the victim were at home alone when an argument began that involved some sort of physical altercation. The Defendant, who was "mad," left the marital residence and went to his mother's house while the victim remained in the trailer. Medical testimony indicated that the victim may have been dead at this time, two to three days before the autopsy. The Defendant told his mother that the victim assaulted him with a beer bottle, and that he "hit" the victim. Ms. Lewis observed marks on the Defendant's head and arms. The victim, who generally went to work early, did not show up for work on Saturday morning, July 31, nor did she call to let her supervisors know she would not be at work. Her failure to show up for work or notify anyone of her absence was inconsistent with her work history, causing the "concern" of a co-worker, who reported the victim's absence.

The Defendant spent the night at his mother's house to "cool off" after the argument with the victim, while the victim's body decomposed in the bedroom of the trailer. The Defendant went home on Sunday afternoon, and when he returned to his mother's residence, he reported that the victim was dead. Ms. Lewis, not believing her son, went to check on her

daughter-in-law and found her dead. A beer bottle was stuck in the wall above where the victim's body lay. Ms. Lewis immediately called 911 and tearfully reported the victim's death and the earlier argument between the victim and the Defendant. When Ms. Lewis told the Defendant that the victim was dead, he responded, "Mamma, they're probably going to think that I did it." The Defendant remained at his mother's house until police were arriving and then fled. He stayed at his aunt's house Sunday night rather than returning to his home, where authorities were investigating the death of his wife, or returning to his mother's house where he had stayed the night before. The Defendant did not contact any of his four children to tell them about their mother's death.

Medical testimony indicated that the victim was young and showed no indication of illness or disease. There was "thickness" around one of her ventricles, indicating "it is possible" the victim's heart was enlarged, but the medical examiner, Dr. Deering, could not conclude that a heart issue related to this "thickness" was the cause of death. The autopsy report indicated that "suffocation cannot be ruled out" in this case. Dr. Deering testified that suffocation can occur with little or no physical traces of the conduct causing the suffocation. The body in this case was "moderately decomposed," thus erasing some of the possible signs or indicators of asphyxia or suffocation. Dr. Deering opined that to kill a person by suffocation, the oxygen supply must be cut off for two to four minutes. Medical testimony on lividity patterns on the victim indicated that the victim's body was moved after she died.

Police investigating the victim's death found a freshly dug hole, consistent in appearance with a grave, behind the home of the victim and the Defendant. The hole measured four feet by ten feet and was two to three feet deep. A shovel with wet mud on it was found in the hole. A tractor with a front loader attachment was parked in the front yard. The tractor also had wet mud caked in the tire treads and "fresh dirt" in the bucket of the loader. The Defendant's children provided inconsistent testimony as to why and when the hole in the back yard was dug.

In our view, this is sufficient evidence for a trier of fact to find, beyond a reasonable doubt, that the Defendant knowingly killed the victim. It is not this Court's role to reweigh the evidence or determine the credibility of witnesses. *See State v. Raynella Dossett Leath*, NO E2011-00437-CCA-R3-CD, 2013 WL 2420639, at *21-26 (Tenn. Crim. App., at Knoxville, June 3, 2013) (affirming a first degree murder conviction based on circumstantial evidence and finding that "[t]he mere fact that the jury chose the State's plausible theory over that of the [d]efendant's does not justify overturning the jury's verdict"). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Reid*, 91 S.W.3d at 277. Based upon the Defendant's anger following a physical altercation with his wife, his response to the discovery of his wife's body, the freshly dug grave-like hole behind the home, the evidence that the body of the victim had been moved

after her death, and the Defendant's subsequent flight from authorities the jury could reasonably infer that the Defendant participated in his wife's death.

Furthermore, the jury, as the trier of fact, was "'free to accept or reject any part . . . under elementary rules for considering evidence.'" *State v. Charles Brandon Hanner*, No. M2005-01944-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, June 8, 2006) (quoting *State v. Roger W. Teague*, No. 85-210-III, slip op. at 3 (Tenn. Crim. App., Nashville, August 19, 1986)). By its verdict, the jury credited Dr. Deering's medical opinion that suffocation could not be ruled out, in light of the circumstances surrounding the victim's death. Based upon Dr. Deering's testimony that to cause death by suffocation one must cut off the air supply for two to four minutes, the jury could reasonably infer that the Defendant knowingly killed the victim by suffocating her.

The jury observed and heard the witnesses testify at trial and weighed the evidence the State presented. The jury made reasonable inferences based on this evidence and convicted the Defendant, beyond a reasonable doubt, of the second degree murder of his wife. Accordingly, we conclude that there was sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of the second degree murder of his wife. The Defendant is not entitled to relief as to this issue.

### B. Jury Sequestration

The Defendant argues that the trial court erred by denying his request that the jury be sequestered. Our criminal code provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." T.C.A. § 40-18-116. This Court reviews a court's denial of a request for sequestration of the jury on an abuse of discretion basis. *See State v. Larry Walcott*, No. E2004-02705-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Knoxville, Aug. 22, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006).

Our review of the record shows that the trial court initially denied the defendant's request for sequestration at a pretrial motion hearing, stating that "traditionally sequestering is ordered for first degree and where there is a life without parole or a death penalty . . . . But in this case until something further is shown to the court, the court denies a sequestration request." The Defendant renewed his request for sequestration of the jury prior to trial, and again the trial court denied the motion, stating that nothing led the court to believe that the jury "cannot follow instructions that the court would give them. The court will specifically instruct them not to read the newspapers or watch television reports." At the conclusion of the first day of trial, the trial court thoroughly admonished the jury to avoid reading the

newspaper, watching the news on television, searching for information on the Internet, discussing the case with others, or attempting to "find where any of this happened or to do some viewing of any area." Before resuming the trial on the following morning, the trial court extensively questioned the jurors to determine if they had all followed his instructions, and no one indicated that he or she had failed to do so. In light of the trial court's admonitions to the jury to avoid media coverage of the trial and the lack of any reported violations of the trial court's explicit instructions, we cannot say that the Defendant suffered any prejudice as a result of the trial court's denial of his motion to sequester the jury.

Accordingly, the trial court did not abuse its discretion by denying the Defendant's request that the jury be sequestered. The Defendant is not entitled to relief as to this issue.

### C. Photographs

The Defendant next contends that the trial court erred by admitting into evidence photographs of the deceased victim because the photographs "were particularly horrific" given the depiction of the settling of bodily fluids.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id*. at 950–51. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

In the present case, the trial court admitted five photographs of the deceased's body as she was discovered at the scene and one photograph of the deceased at autopsy. Exhibit 1 depicted the deceased lying on the bedroom floor in the position in which she was discovered by law enforcement officers. The victim's left arm and right leg from the knee down can not be seen due to the angle of the photograph. Exhibit 5 is a close-up that depicts

the victim from the waist up and her position in the bedroom between the bed and dresser. The discoloration of her face and the dark red blood that has drained from her nose is more visible. Exhibit 6 is a close-up of the victim's right hand and arm and a small portion of her right leg that have maintained coloration. Exhibit 7 is a close-up of the victim's left arm, which shows dark reddish-purple discoloration. Exhibit 8 shows the deceased's legs and feet. The left leg and foot are clearly dark reddish-purple, and the right leg and foot, particularly the upper portion of the leg, appear fairly normal in skin tone. Finally, Exhibit 20, depicts the deceased's back at autopsy and shows a large white area around the deceased's left shoulder blade, which Dr. Deering describes during his testimony as "blanching," while the remainder of her back is a dark reddish-purple.

At a pretrial motion hearing to determine the admissibility of the photographs, the trial court found that the pictures were not "horrific" or "unduly gruesome" and that the probative value of the photographs outweighed any prejudicial effect. In particular, the trial court found the autopsy photograph to be "relevant to this issue having to do with whether the body has been moved." The trial court ruled that the photograph "is one that [Dr. Deering] indicates does help him in his testimony to show what he's seeing."

We first note that the Defendant challenges the photographs of the victim on the basis that the photographs are evidence of "other crimes, wrongs, or acts," and are inadmissible pursuant to Tennessee Rule of Evidence 404(b). The photographs of the victim admitted at trial are photographs taken at the crime scene and subsequent autopsy as related to this case. As earlier stated, we believe this issue to be governed by Tennessee Rules of Evidence 401 and 403 and will analyze this issue accordingly.

We disagree with the Defendant's contention that the photographs should have been omitted because of the depiction of how the bodily fluids had settled. The settling of the bodily fluids is the issue that made the photographs relevant. Dr. Deering testified that the victim's body had been moved. Because of the presence of a dead body in the Defendant's residence and a freshly dug "grave" in the Defendant's back yard, the movement of the victim's body was relevant to the State's theory of the case. In order for Dr. Deering to explain how he could conclude that the victim's body had been moved, the jury needed to understand lividity. The photographs assisted the jury in understanding lividity and observing how Dr. Deering could conclude that the victim was initially lying on her left side, even though the police ultimately found the victim lying on her back.

Additionally, the photographs showed the victim in the position in which authorities found her when they first entered the trailer. Dr. Deering testified that the victim had at some point been lying on the left side of her body and, with the use of the photographs, showed the jury how he knew the victim had been lying on her left side. The crime scene photographs

show the victim lying on her back. The defense offered the jury the explanation that Ms. Lewis moved the body when she was attempting to find a pulse, even though Ms. Lewis did not tell Detective Golden she had moved the body and testified on redirect examination that she found the victim lying on her back. The State offered the theory that, after the Defendant suffocated the victim, he later unsuccessfully attempted to move the victim's body to the freshly dug hole behind the trailer. The photographs assisted the jury in understanding Dr. Deering's testimony regarding lividity and whether the victim's body had been moved.

Accordingly, the trial court did not abuse its discretion when it admitted photographs depicting the position of the victim's body when the police found her and depicting lividity to aid Dr. Deering in his explanation of medical testimony. The Defendant is not entitled to relief as to this issue.

### D. Witness Testimony

Finally, the Defendant contends that the trial court erred by allowing Mr. Ownby, the life insurance agent, to testify as to his feelings and by failing to instruct the jury to disregard those statements. Specifically, Mr. Ownby testified that he "felt threatened" and "a little scared" when the defendant called him and demanded insurance proceeds. At that point in the testimony, defense counsel objected, and the trial court sustained the objection. No curative instruction was requested.

Although the Defendant complains that the trial court erred by failing to issue a curative instruction, the record establishes that none was requested. Because the Defendant failed to seek a curative instruction, he has waived our consideration of the issue. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987) (holding that "failure to request [a] curative instruction[]" is failure to take action "reasonably available to prevent or nullify the harmful effect of an error").

Moreover, the Defendant has failed to cite any authority in his brief in support of this argument, and for that additional reason, this issue has been waived. *See* Tenn. R. Crim. Ct. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### III. Conclusion

In accordance with the foregoing reasoning and authorities, the judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE